FILL R. SWICONEK, TRUSTEE OF THE MARION E.
SWICONEK REVOCABLE TRUST, DATED
FEBRUARY 8, 2007 *v.* ZONING BOARD
OF APPEALS OF THE TOWN
OF GLASTONBURY ET AL.

Superior Court, Judicial District of Hartford

File No. CV-08-4038134-S

Memorandum filed March 20, 2009

*Barry, Harvey & Later, PC*, for the plaintiff.

*Shipman & Goodwin, LLP*, for the named defendant.

*Peter J. Alter*, for the defendant Mill Street Realty II, LLC.

HON. JOHN J. LANGENBACH, JUDGE TRIAL REFEREE. On May 15, 2008, the defendant Mill Street Realty II, LLC (applicant), filed an application with the defendant zoning board of appeals of the town of Glastonbury (board) seeking a variance from side yard restrictions on its property, which is located at 45 Mill Street in Glastonbury. Notice of the public hearing was published in the Glastonbury Citizen on May 22 and 29, 2008. Following a public hearing on June 2, 2008, the board granted the application, and notice of this decision was published in the Glastonbury Citizen on June 5, 2008.

The plaintiff, Fill R. Swiconek, commenced this timely appeal by service of process on the defendants on June 13, 2008. In the appeal, the plaintiff alleges that he is the trustee of the Marion E. Swiconek revocable trust, dated February 8, 2007 (trust), and that he resides at 27 Garland Drive in Glastonbury. He claims to be aggrieved by the board's decision "in that he owns abutting property located at 65 Mill Street, Glastonbury, Connecticut." The plaintiff alleges that the board "acted illegally, arbitrarily and in abuse of the discretion vested" in it because (1) the applicant did not demonstrate a legal hardship, (2) the board's decision is unsustainable in view of the evidence before the board, (3) the board's decision to grant the variance "is based upon such errors of law and fact as the record may reveal," and (4) the board's decision did not conform to the zoning regulations concerning variances, including the stated criteria for granting variances.

The defendants filed their answers on September 23 and 29, 2008, and the board filed the return of record

on October 17, 2008. The plaintiff filed a pretrial brief on December 9, 2008, and the defendants filed a joint brief on February 9, 2009. The parties were heard before this court on February 18, 2009. Prior to the hearing, the plaintiff also filed a reply memorandum, which the court will consider for purposes of the present appeal.

"The standard of review on appeal from a zoning board's decision to grant or deny a variance is well established." *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 205, 658 A.2d 559 (1995). The court must find "that the board's act was not arbitrary, illegal or an abuse of discretion. . . . Courts are not to substitute their judgment for that of the board . . . and decisions of local boards will not be disturbed so long as honest judgment has been reasonably and fairly exercised after a full hearing. . . . Upon appeal, the trial court reviews the record before the board to determine whether it has acted fairly or with proper motives or upon valid reasons. . . . The burden of proof to demonstrate that the board acted improperly is upon the plaintiffs." (Citations omitted; internal quotation marks omitted.) Id., 205–206.

"[P]leading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. . . . [I]n order to have standing to bring an administrative appeal, a person must be aggrieved. . . . Aggrievement presents a question of fact for the trial court and the party alleging aggrievement bears the burden of proving it." (Internal quotation marks omitted.) *Alvord Investment, LLC* v. *Zoning Board of Appeals*, 282 Conn. 393, 399–400, 920 A.2d 1000 (2007).

"Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other

words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *Pond View, LLC* v. *Planning & Zoning Commission*, 288 Conn. 143, 156, 953 A.2d 1 (2008).

General Statutes § 8-8 (a) (1) provides in relevant part: " 'Aggrieved person' means a person aggrieved by a decision of a board and includes any officer, department, board or bureau of the municipality charged with enforcement of any order, requirement or decision of the board. In the case of a decision by a . . . zoning board of appeals, 'aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the board."

Although the defendants do not admit in their answer that the property held by the trust at 65 Mill Street abuts the applicant's property at 45 Mill Street, the site plan submitted with the application shows that the properties are abutting. Therefore, 65 Mill Street falls within the zone of statutory aggrievement.

The defendants contend, however, that the plaintiff is not aggrieved because he is not the "owner" of 65 Mill Street for purposes of § 8-8 (a) (1). The defendants argue that (1) the plaintiff must prove that he is the trustee of a valid trust, (2) the plaintiff is not aggrieved because he has admitted that his mother, not the trust, owns the abutting property, and (3) that even if the trust is valid, the plaintiff is not aggrieved because the settlor of a revocable trust, not the trustee, is the owner of the trust property.

"The requisite elements of a valid and enforceable trust are: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries,

to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries. 1 Restatement (Third), Trusts § 2, comment (f), p. 21 (2003) . . . ." (Citation omitted; internal quotation marks omitted.) *Palozie* v. *Palozie*, 283 Conn. 538, 545, 927 A.2d 903 (2007).

The plaintiff has submitted a copy of the Marion E. Swiconek revocable trust dated February 8, 2007. The introductory clause of the trust states that Marion E. Swiconek is the grantor and Fill R. Swiconek is the trustee. Article V lists the beneficiaries to the trust. Article I states that the grantor has conveyed property listed in the attached schedule A to the trust as well as "any other property that may be received or which has been received by the trustees . . . ." Schedule A lists assets, including a stamp collection and a coin collection. In addition, the plaintiff has submitted a certified copy of a quitclaim deed transferring the property at 65 Mill Street to "Fill Swiconek, trustee of the Marion E. Swiconek revocable trust dated February 8, 2007," on April 13, 2007.

The trust is valid and enforceable because it identifies a trustee, beneficiaries and trust property held for the beneficiaries.

It is true that "the settlor may reserve extensive powers over the administration of a trust . . . and may reserve the right to modify or revoke the trust at will." (Citation omitted; internal quotation marks omitted.) *Palozie* v. *Palozie*, supra, 283 Conn. 546. Yet "[t]he issue of intent as it relates to the interpretation of a trust instrument . . . is to be determined by examination of the trust instrument itself and not by extrinsic evidence of actual intent . . . ." (Citation omitted; internal quotation marks omitted.) Id., 546–47.

At both the public hearing before the board and the hearing before this court, the plaintiff admitted that his mother has some level of control over the use of 65 Mill Street. At the public hearing, he stated that 65 Mill Street was "my mom's property" and that "my mom hasn't wanted to do anything with" the property. Before the court, he stated that decisions concerning the use of 65 Mill Street were made through "discussion" among the beneficiaries but his mother had "the last word" in any decision.

Nevertheless, under the plain language of article I of the trust, the plaintiff's mother has "paid over, assigned, granted, conveyed, transferred and delivered" 65 Mill Street to the plaintiff as trustee, thereby giving the plaintiff control over land use decisions related to that property. Although article III of the trust permits her to amend the trust, there is no evidence on the record that she has elected to do so by "signed instruments delivered to the trustee during the grantor's life," as required by the trust agreement.

Because the plain language of the trust transfers control over the property to the plaintiff as trustee, it would be inappropriate to consider extrinsic evidence of the settlor's intent in interpreting the trust.

"[T]he word 'owner' has no fixed meaning but must be interpreted in its context and according to the circumstances in which it is used. . . . Courts have not agreed in the application of the meaning of the word, even when due allowance is made for the differing phraseology of the statutes involved and the circumstances under consideration." (Internal quotation marks omitted.) *Smith* v. *Planning & Zoning Board*, 203 Conn. 317, 322, 524 A.2d 1128 (1987).

The Connecticut appellate courts have not decided whether a trustee may be considered the "owner" of

property held in trust for purposes of aggrievement under § 8-8 (a) (1).

The appellate courts have interpreted § 8-8, however, to include life tenants as "owners" who have standing to bring statutory aggrievement claims. In examining the question of whether a life tenant was an "owner" for purposes of § 8-8, the Appellate Court held that "[t]he term 'owner' is one of general application and includes one having an interest other than the full legal and beneficial title." (Internal quotation marks omitted.) *Smith* v. *Planning & Zoning Board*, 3 Conn. App. 550, 553, 490 A.2d 539 (1985), aff'd, 203 Conn. 317, 524 A.2d 1128 (1987). The Appellate Court held that the protections afforded by the Marketable Title Act, General Statutes §§ 47-33b through 47-33*l*, applied to the life tenant's ownership interest because it was "a life interest expressly reserved by recorded deed . . . ." *Smith* v. *Planning & Zoning Board*, supra, 554. The court reasoned that if the life tenant's ownership interest was sufficient to be protected by the Marketable Title Act, then the life tenant "ought logically to be able to safeguard that interest through the avenue of appeal provided in General Statutes § 8-8." *Smith* v. *Planning & Zoning Board*, supra, 554.

The Supreme Court upheld the Appellate Court's decision, holding that a life tenant "has a sufficient ownership of the locus to entitle her to recognition as a 'person owning land' with the right to appeal under § 8-8." *Smith* v. *Planning & Zoning Board*, supra, 203 Conn. 323. In contrast to the Appellate Court, however, the Supreme Court did not analyze the Marketable Title Act as a basis for protecting the life tenant's interest through § 8-8. Rather, the Supreme Court reasoned that the life tenant had sufficient ownership rights to entitle her to the right of appeal under § 8-8. In particular, the court found that the life tenant (1) had a freehold estate for the duration of her life subject to her direction and

control, (2) had the right to undisturbed possession and any income or fees derived from the land, and (3) could convey the estate to a third party. Id. Therefore, the court held that a life tenant was an "owner" for purposes of § 8-8. Id.

In *Field Point Park Assn. v. Planning & Zoning Commission,* Superior Court, judicial district of Stamford-Norwalk, Docket No. SPCV-03-0196430 (April 18, 2005) (*Wilson, J.*) (39 Conn. L. Rptr. 179), the court held that the settlor and sole beneficiary of a revocable inter vivos trust was the "owner" pursuant to § 8-8. In that case, "the trust gives [the settlor] the exclusive, rent-free right of possession, imposes no restrictions on the use of the land, entitles [the settlor] to any profits generated by the sale of the property and provides that, upon [the settlor's] death, the property shall be disposed of as part of his estate." Id.

The court relied on the reasoning of the Supreme Court in *Smith v. Planning & Zoning Board,* supra, 203 Conn. 323, finding that the settlor's "rights in the land include all of those interests that constitute the essence of ownership, and he is, therefore, the owner in every beneficial sense." *Field Point Park Assn. v. Planning & Zoning Commission,* supra, 39 Conn. L. Rptr. 179. The court also applied 1 Restatement (Third), supra, § 25 (2), p. 377, which states that "the property of [a revocable inter vivos] trust is ordinarily treated as though it were owned by the settlor." (Internal quotation marks omitted.) *Field Point Park Assn. v. Planning & Zoning Commission,* supra, 179. Furthermore, the court interpreted a related statute concerning disclosure of equitable ownership or the beneficiaries of a trust, General Statutes § 8-7c,[1] finding that "[t]he legislature . . . contemplated that trust beneficiaries may

---

[1] General Statutes § 8-7c provides: "Any person who makes an application to a planning commission, zoning commission or zoning board of appeals pertaining to real property, the record title to which is held by a trustee of an undisclosed trust, shall file with said application a sworn statement

have a significant interest in, and control over, the subject property. This bolsters the holding that trust beneficiaries may be owners within the meaning of § 8-8 (1)." *Field Point Park Assn.* v. *Planning & Zoning Commission,* supra, 179.

The defendants argue that *Field Point Park Assn.* v. *Planning & Zoning Commission,* supra, 39 Conn. L. Rptr. 179, holds that the settlor of a revocable inter vivos trust, rather than a trustee, is the owner pursuant to § 8-8. This interpretation is too narrow. In reaching its decision, the court primarily relied on the Supreme Court's decision in *Smith* v. *Planning & Zoning Board,* supra, 203 Conn. 323, which broadly interpreted § 8-8 to include a life tenant as an aggrieved party on the basis of evidence of the life tenant's indices of ownership. The settlor in *Field Point Park Assn.,* like the life tenant in *Smith,* reserved significant ownership rights for himself. In both cases, because the term "owner" could be generally applied to interests other than "full legal and beneficial title," the courts found that the plaintiffs were aggrieved. Thus, these cases suggest that § 8-8 should be broadly applied to situations in which the plaintiff may not be the owner of record but rather an individual with sufficient indices of ownership.

Furthermore, the *Field Point Park Assn.* court's citation of the section of the Restatement (Third) of Trusts, concerning the presumption of ownership in a revocable inter vivos trust was tangential to its finding of aggrievement, and analysis of that Restatement section shows that it is not designed to limit a trustee's right to file an appeal. Although commentators recognize that the property of a revocable inter vivos trust "is ordinarily treated as though it were owned by the settlor"; 1 Restatement (Third), supra, § 25 (2), p. 377; this

disclosing the name of the equitable owner of such real property or the beneficiary of the trust."

presumption exists to protect creditors. Comment (e) to § 25 (2) clarifies that "property held in the trust is subject to the claims of creditors of the settlor or of the deceased settlor's estate if the same property belonging to the settlor or the estate would be subject to the claims of the creditors, taking account of homestead rights and other exemptions. This result . . . is based on the sound public policy of basing the rights of creditors on the substance rather than the form of the debtor's property rights." Id., § 25 (2), comment (e), pp. 386–87. Thus, this Restatement provision is designed to protect the rights of a settlor's creditors, not to create a barrier to a trustee's enforcement of a settlor's statutory right to file an administrative appeal.

In this case, under the terms of the trust agreement, the plaintiff as trustee has the powers to "compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise deal with and settle claims in favor of or against the Trust Estate as the Trustee shall deem best"; article VIII (17); and, "[i]n general, to exercise all powers in the management of the Trust Estate which any individual could exercise in his or her own right, upon such terms and conditions as it may reasonably deem best, and to do all acts which it may deem reasonably necessary or proper to carry out the purposes of this Trust Agreement." Article VIII (22); see also General Statutes § 52-106 (trustee of express trust may sue or be sued without joining persons represented by him and beneficially interested in action).

On the basis of this language, the trustee has a sufficient ownership interest to be considered an owner for aggrievement purposes. This result is consistent with holdings of the Supreme Court that plaintiffs with less than full legal title may be considered owners for purposes of statutory aggrievement. *Smith* v. *Planning & Zoning Board*, supra, 203 Conn. 323.

The plaintiff, as trustee, is aggrieved because he is empowered under the terms of the trust agreement to bring lawsuits on behalf of the trust to protect the trust's interests and that he is, therefore, the "owner" of abutting property for purposes of § 8-8.

General Statutes § 8-6 (a) provides in relevant part: "The zoning board of appeals shall have the following powers and duties . . . (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured, provided that the zoning regulations may specify the extent to which uses shall not be permitted by variance in districts in which such uses are not otherwise allowed. . . ."

"[T]he authority of a zoning board of appeals to grant a variance under General Statutes § 8-6 [a] (3) requires the fulfillment of two conditions: (1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan." (Internal quotation marks omitted.) *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 295, 947 A.2d 944 (2008).

The Supreme Court has explained that "[o]ne who seeks a variance must show that, because of some

unusual characteristic of his property, a literal enforcement of the zoning regulations would result in unusual hardship to him. . . . The hardship complained of must arise directly out of the application of the ordinance to circumstances or conditions beyond the control of the party involved. . . . Where the condition which results in the hardship is due to one's own voluntary act, the zoning board is without the power to grant a variance. . . . Where . . . the hardship arises as the result of a voluntary act by one other than the one whom the variance will benefit, the board may, in the sound exercise of its liberal discretion, grant the variance. . . . Disadvantage in property value or income, or both, to a single owner of property, resulting from application of zoning restrictions, does not, ordinarily, warrant relaxation in his favor on the ground of . . . unnecessary hardship. . . . Financial considerations are relevant only in those exceptional situations where a board could reasonably find that the application of the regulations to the property greatly decreases or practically destroys its value for any of the uses to which it could reasonably be put and where the regulations, as applied, bear so little relationship to the purposes of zoning that, as to particular premises, the regulations have a confiscatory or arbitrary effect. . . . Zoning regulations have such an effect in the extreme situation where the application of the regulations renders the property in question practically worthless." (Citations omitted; internal quotation marks omitted.) *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 561–62, 916 A.2d 5 (2007).

To expand its manufacturing business located at 25 Mill Street, the applicant purchased a neighboring property at 45 Mill Street located in the town's planned employment zone. Subsequently, the applicant filed an application for a variance on May 13, 2008, seeking relief from § 4.14.12 of the Glastonbury zoning regulations,

which establishes a 100 foot setback between industrial buildings and residential zones.[2] The property at 45 Mill Street is bounded on the north by a residential zone that continues to the north on Mill Street. The standard required side yard in the planned employment zone is twenty-five feet, but when the planned employment zone property is located adjacent to a residential property, the building setback required increases to 100 feet, pursuant to § 4.14.12 of the Glastonbury zoning regulations. The applicant sought relief from the building setback requirement, seeking permission to construct the proposed building at 45 Mill Street with a side yard setback that would be no closer than fifty-five feet from the residential zone's boundary line.

In its May 13, 2008 application, the applicant's claimed hardship in complying with the setback regulation was that it could not build an efficient manufacturing facility without "a minimum size and configuration." Given the "narrow configuration of the existing lot," an efficient facility could not be built with a 100 foot side yard setback without disrupting neighboring residential property owners or disturbing wetlands that divide the property.

The applicant explained that it had considered reversing its building's layout to meet the 100 foot setback requirement but rejected constructing a conforming building for several reasons. If the building were reversed, the driveway servicing this building would have to be placed on the northern side of the property

[2] Section 4.14.12 of the Glastonbury zoning regulations provides: "Minimum Distance And Screening From A Residential Zone Or Use. All business and industrial buildings, structures and uses shall be located a minimum distance of at least one hundred (100) feet from the boundary line of any residential zone, and all parking areas shall be located a minimum distance of at least fifty (50) feet from the boundary line of any residential zone. Screening and landscaping of the open space adjoining any residential zone or residential use may be required by the [town plan and zoning] Commission."

adjacent to the residential zone, rather than on the southern side next to the existing manufacturing facility. Employees using this driveway would be "a source of noise and light" to the neighbors in the residential zone. Furthermore, because land in the planned employment zone had previously been leveled, there was already a substantial change in grade between 65 Mill Street and the residential zone that could be utilized to create a "visual and sound" buffer between the properties along the proposed fifty-five foot setback. Finally, the applicant argued that the presence of wetlands on the property further constricted its ability to build its facility. Therefore, the applicant sought a variance allowing it to build its proposed manufacturing facility within fifty-five feet of the residential zone.

At the public hearing on June 2, 2008, the applicant's attorney repeated these arguments before the board. Then, board members made the following pertinent comments before approving the application.

James Van Law, Jr., a member of the board, made a motion to approve the variance application, stating: "The applicant could just go ahead and build this and not have come to us and not say anything and the residential zone next to it would be, they would be, you know, crazy people because I think there will be way more noise pollution, way more disruption, way more issues, all kinds of problems than what they actually did here. And it seems to me that . . . there was some great amount of thought put into the layout of this building with a great amount of thought to what was going to happen to their neighbors. . . . I was impressed almost to the detail of the line that was drawn in the middle of the building . . . . [I]t was great corporate citizenship . . . . [T]his is one of those things where I think that there's every single effort has been made to really look at . . . the impact of building . . . and

try to do the right thing, and so I'm gonna vote in favor of this."

Sandra O'Leary, vice chairman of the board, discussed the application's impact on traffic and stated that the applicants who "do take care of their property, and I think they care about the neighbors . . . and will be good neighbors to everybody, or at least try." She voiced approval of the applicant's parking plan.

John Linderman, chairman of the board, stated: "[M]y feelings are that the way the building has been oriented with the loading docks and so on to the west rather than to the east side will in fact be closer to what your interests are in keeping the neighborhood quiet and not noisy."

Following the public hearing, the board approved the application and made the following written record explaining its decision: "1. That the applicant could build the proposed structure in compliance to be no closer than fifty-five feet from the property line and that building would actually cause greater noise pollution and greater disruption than the proposed plans before this [b]oard. 2. That the additional steps to mitigate disruption to the residential zone have been taken by the applicant by the proposed planting of trees and other vegetative proposals, as well as the existing grade of the lot. 3. Referral to [town plan and zoning], wetlands commission and other referrals that are required. 4. All criteria of [§] 13.9[3] [of the Glastonbury zoning regulations] have been met."

In his appeal, the plaintiff argues that the board's granting of the variance was illegal because the applicant did not prove a hardship and, therefore, the board's

---

[3] Section 13.9 of the Glastonbury zoning regulations provides certain criteria for the zoning board of appeals to use when evaluating variance applications, including the appropriateness of the location or use, conformance with existing zoning and building regulations, and any impact on health, safety and the environment.

reasons for approving the variance were inadequate. The plaintiff argues that because the proposed manufacturing facility could have been built without the variance, the applicant did not face the exceptional difficulty or unusual hardship necessary to justify a variance.

The plaintiff contends that the Appellate Court's decision in *Jaser* v. *Zoning Board of Appeals*, 43 Conn. App. 545, 684 A.2d 735 (1996), is dispositive of his appeal. In that case, the Appellate Court reversed the trial court's decision sustaining a property owners' appeal from the zoning board of appeals' denial of a variance. Id. The court held that the owners, who sought a variance to construct a single-family home with a twenty foot setback where the regulations mandated a thirty foot setback, had not suffered a hardship. Id., 548. "[A] hardship was not shown because the plaintiffs admitted that a house, even though not the type that they desired, could have been built on the lot while conforming to the setback requirements. Disappointment in the use of property does not constitute exceptional difficulty or unusual hardship . . . . It is well established that the power to grant a variance should be sparingly exercised. . . . In addition . . . the plaintiffs had an alternative route *to accomplish their purpose without seeking a* variance." (Citations omitted; internal quotation marks omitted.) Id.

In response, the defendants argue that a hardship may be found even if an alternative use is possible without the variance. They cite the Appellate Court's decision in *Jersey* v. *Zoning Board of Appeals*, 101 Conn. App. 350, 921 A.2d 683 (2007), in which the court held that "whether a property retains any reasonable use *can* be a test for determining a hardship in some circumstances, *but is not a prerequisite* in all cases." (Emphasis in original.) Id., 357–58. The defendants

claim that *Jersey* broadens a zoning board of appeals' discretion to grant variances and contradicts the following standard for granting appeals set forth in *Jaser* v. *Zoning Board of Appeals*, supra, 43 Conn. App. 546 n.2: "To establish a hardship under General Statutes § 8-6, an applicant must show not only that he is thwarted in a desired use of land, but also that he is being completely or almost completely deprived of the use of the value of that land. See *Chevron Oil Co.* v. *Zoning Board of Appeals*, 170 Conn. 146, 151–52, 365 A.2d 387 (1976); *Devaney* v. *Zoning Board of Appeals*, 132 Conn. 537, 542, 45 A.2d 828 (1946)."

In *Jersey* v. *Zoning Board of Appeals*, supra, 101 Conn. App. 359–60, the Appellate Court struck down a zoning regulation that limited the zoning board of appeals' power to grant variances to applicants who could demonstrate "the rare circumstance in which a property is rendered practically worthless" because the regulation "impermissibly limits the power, given by the General Assembly, of the [board of appeals] to grant variances in cases in which a hardship has been established, even if the property may be put to some other reasonable use." The Appellate Court held that a zoning board of appeals may "grant a variance where the comprehensive zoning plan will not be substantially affected and adherence to the strict letter of the zoning regulations would cause an unusual hardship that is unnecessary to the carrying out of the general purpose of the zoning plan." Id., 359. The court stated that a hardship could be found in "the extreme situation where the application of a regulation renders property practically worthless, and that loss of value alone amounts to a hardship. . . . [A] variance may be granted if the literal enforcement of a regulation causes exceptional difficulty or hardship because of some unusual characteris-

tic of the property." (Citations omitted; internal quotation marks omitted.) Id., 358–59.

In light of the Appellate Court's holding in *Jersey*, the court's test in *Jaser* for establishing hardship may be too limiting because an applicant need not show that a zoning regulation has deprived the property of all reasonable use to obtain a variance. Rather, *Jersey* establishes that a zoning board of appeals retains discretion under § 8-6 (a) (3) to grant a variance when enforcement of a zoning regulation creates a hardship and preserves the board of appeals' power to grant a variance even when the property may retain a reasonable use. The Appellate Court's affirmation of a zoning board of appeals' discretion in *Jersey*, however, does not contradict the ground on which the court in *Jaser* upheld the board's denial of the variance application: that " '[d]isappointment in the use of property' " does not constitute exceptional difficulty or hardship. *Jaser* v. *Zoning Board of Appeals*, supra, 43 Conn. App. 548.

Thus, even if the applicant can configure the property to comply with the zoning regulations without recourse to obtaining a variance, *Jaser* is not dispositive of this appeal if the record would support a finding by the board that the applicant suffered a hardship arising "directly out of the application of the ordinance to circumstances or conditions beyond the control of the party involved." (Internal quotation marks omitted.) *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 561.

The defendants argue that the applicant presented ample evidence of a hardship to the board that supported its granting of a variance, including the narrowness of the lot, the presence of wetlands and the fact that the lot was created before the enactment of the setback ordinance. Although the applicant admitted that it could build the proposed facility in conformance

with the setback requirement, it believed that a conforming structure would be less efficient for manufacturing purposes[4] and would be more offensive to the neighboring residential landowners.

The board's collective stated reasons for granting the variance were: "1. That the applicant could build the proposed structure in compliance to be no closer than fifty-five feet from the property line and that building would actually cause greater noise pollution and greater disruption than the proposed plans before this [b]oard. 2. That the additional steps to mitigate disruption to the residential zone have been taken by the applicant by the proposed planting of trees and other vegetative proposals, as well as the existing grade of the lot. 3. Referral to [town plan and zoning], wetlands commission and other referrals that are required. 4. All criteria of [§] 13.9 [of the Glastonbury zoning regulations] have been met."

Essentially, as stated in reasons one and two, the board found that allowing the applicant to build the proposed nonconforming facility would be more beneficial to neighbors than a compliant structure and that the applicant had taken sufficient measures to shield the neighbors from the impacts of its expansion. The board also found, in reason four, that the applicant met the miscellaneous criteria of § 13.9 of the Glastonbury

---

[4] The Supreme Court has held that "the denial of the right to use modern, up-to-date methods in order to remain competitive" is an improper reason to grant a variance. (Internal quotation marks omitted.) *Berlani* v. *Zoning Board of Appeals*, 160 Conn. 166, 170–71, 276 A.2d 780 (1970); see also *Horace* v. *Zoning Board of Appeals*, 85 Conn. App. 162, 171, 855 A.2d 1044 (2004) ("[a]lthough the variance might allow [the applicant] to operate his commercial activities more efficiently, it is well established that financial considerations, unless they greatly decrease or destroy the value of the property, do not constitute a cognizable legal hardship that would warrant a variance"). Thus, the applicant may not claim a hardship solely on the basis of its interest in building the most economically efficient facility on the property.

zoning regulations. This finding reinforced the board's underlying ground for granting the variance: that a nonconforming structure would be more beneficial to the neighboring property owners than a conforming one that did not require a variance.

This ground for granting a variance is inadequate as a matter of law. A zoning board of appeals may not grant a variance solely on the ground that allowing a nonconforming use would be beneficial to neighboring property owners. See, e.g., *Hyatt* v. *Zoning Board of Appeals*, 163 Conn. 379, 380, 311 A.2d 77 (1972).

The defendants correctly point out that the appellate courts have held that the elimination of a nonconforming use constitutes an independent ground for sustaining the granting of a variance. *Vine* v. *Zoning Board of Appeals*, supra, 281 Conn. 570–72 (variance from square footage requirement supported granting variance where it lessened nonconformity and did not cause even minimal harm to neighborhood); *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 706, 535 A.2d 799 (1988) (variance upheld where owners of nonconforming foundry sought to convert property into nonconforming auto repair shop because new use would be " 'far less offensive' " to neighbors); *Hescock* v. *Zoning Board of Appeals*, 112 Conn. App. 239, 260, 962 A.2d 177 (2009) (fifty-three foot variance justified by decrease in noncompliance with 100 foot setback requirement and elimination of noncompliance with all remaining flood zone regulations); *Stancuna* v. *Zoning Board of Appeals*, 66 Conn. App. 565, 572, 785 A.2d 601 (2001) (variance to setback requirements upheld where variance eliminated nonconforming residential use and allowed for conforming commercial use).

By contrast, in the present case, there is no evidence in the record that the applicants are seeking a variance to reduce an existing nonconformity. Rather, they seek

to introduce a new structure on a vacant lot that would not conform with the zoning regulations. Thus, the rule established in *Adolphson*, which applies to variances designed to lessen nonconformities, is inapplicable to this case.

The defendants contend that three Superior Court decisions have held that a zoning board of appeals may consider the effect of a variance on neighboring properties even if the property is conforming. See *Simons Co.* v. *Zoning Board of Appeals*, Superior Court, judicial district of Ansonia-Milford, geographical area number five, Docket No. CV-02-0078568 (March 24, 2003) (*Hon. George W. Ripley II*, judge trial referee) (variance granted because of unusual hardship created by extensive wetlands on property upheld; board found variance would not impact "stability of property values in the neighborhood"); *Carberry* v. *Zoning Board of Appeals*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-00-0176766 (October 16, 2001) (*Adams, J.*) (30 Conn. L. Rptr. 537) (variance to setback requirement upheld where hardship created by unique boundary lines and public easements not present on neighboring lots that would limit owner's ability to build house in keeping with those of neighbors; board found that granting variance would enhance appearance of residential area by permitting construction of house in keeping with neighborhood); *Nelson* v. *Zoning Board of Appeals*, Superior Court, judicial district of Danbury, Docket No. CV-93-310962 (June 30, 1993) (*Moraghan, J.*) (variance from lot size and other area restrictions upheld where applicant's lot uniquely split by two different zoning districts and by different topographical conditions and board found granting variance would reduce safety hazards in neighborhood).

In each of these decisions, the courts determined that the zoning boards of appeals had substantial evidence

that unique conditions on the properties supported the granting of a variance, including the presence of unusual boundary lines, easements, wetlands and topographical features. These courts' consideration of the effect of the variance on the surrounding community, however, was inapposite because a zoning board of appeals may not grant a variance on the independent ground that the variance would not adversely impact the neighborhood; *Laurel Beach Assn.* v. *Zoning Board of Appeals*, 166 Conn. 385, 387, 349 A.2d 834 (1974); or that the variance would benefit the neighborhood. *Hyatt* v. *Zoning Board of Appeals*, supra, 163 Conn. 380. As Professor Tondro wrote, "zoning boards of appeals have never been permitted to grant variances simply because they would not adversely affect the neighborhood . . . . The decision as to whether the neighborhood will be improved by the variance . . . is properly the decision of the zoning commission, since it is charged with preparing the land use plan for the community. It is not the zoning board of appeals' responsibility or area of expertise (nor is it a court's) to determine whether the *neighborhood* will be improved by a particular use." (Emphasis in original.) T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) p. 135.

The board's finding that the granting of a variance to the setback requirement would improve the neighborhood is an improper basis for granting the variance.

The board's collective written record of approval does not indicate any other basis for finding a hardship. Therefore, because the plaintiff has met its burden of proving that the board acted without sufficient evidence of a hardship, the plaintiff's appeal is sustained. This matter is remanded to the zoning board of appeals for further proceedings consistent with this ruling.